# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-0613V
UNPUBLISHED

|  |  |
|---|---|
| EMILY JAHN,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: December 17, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Althea Walker Davis, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On May 1, 2018, Emily Jahn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered left shoulder injuries caused in fact by the influenza vaccination she received on December 28, 2016. Petition at 1, ¶¶ 2, 11. The case was assigned to the Special Processing Unit of the Office of Special Masters. Although a ruling on entitlement in Petitioner's favor was issued two years ago, the parties have been unable to resolve damages on their own.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all Section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$136,694.55**, **representing $135,000.00 for actual pain and suffering, plus $1,694.55 for past unreimbursable expenses.**

## I.      Relevant Procedural History

Along with the Petition, Emily Jahn filed most of the medical records required by the Vaccine Act. Exhibits 1-9, ECF No. 1; *see* Section 11(c). During the subsequent 16-month period, Petitioner filed the remainder of her medical records and additional evidence regarding the site of vaccination. Exhibits 10-19, ECF Nos. 8, 16, 18-19, 26. On September 17, 2019, Special Master Dorsey[3] issued a fact ruling, finding that Petitioner received the vaccine alleged as causal in her left arm - as alleged, and that the onset of her left shoulder pain occurred within 48 hours of vaccination. ECF No. 29. In late December 2019, Respondent filed a Rule 4(c) Report indicating that he would no longer contest entitlement, and I issued a ruling finding Petitioner entitled to compensation. ECF Nos. 34-35.

Over the subsequent 20-month period, the parties attempted to informally resolve the issue of damages. *E.g.,* Status Report, filed Apr. 12, 2021, ECF No. 59. On September 13, 2021, however, they informed me they had reached an impasse. ECF No. 64. On November 23, 2021, they filed simultaneous damages briefs. ECF Nos. 66-67. Neither party chose to file a responsive brief by the December 9, 2021 deadline. The matter is now ripe for adjudication.

## II.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

---

[3] From September 2015 through October 1, 2019, the SPU was overseen by former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me after I was appointed Chief Special Master.

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, and then to me in early October 2019.

cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.    Prior SIRVA Compensation Within SPU[5]

#### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2021, 2,097 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,036 of these cases, with the remaining 61 cases dismissed.

Of the compensated cases, 1,187 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 69 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,092 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 26 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 849 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[7] Agreement |
|---|---|---|---|---|
| Total Cases | *69* | *1,092* | *26* | *849* |
| Lowest | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| 1st Quartile | $75,000.00 | $70,000.00 | $90,000.00 | $45,000.00 |
| Median | **$97,500.00** | **$90,350.00** | **$115,214.49** | **$65,000.00** |
| 3rd Quartile | $125,360.00 | $119,502.79 | $158,264.36 | $90,000.00 |
| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.    Pain and Suffering Awards in Reasoned Decisions

In the 69 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $95,500.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,000.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

## IV.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including all medical records and affidavits filed plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

### A.     The Parties' Arguments

The parties agree Petitioner should be awarded $1,694.55 for her unreimbursed medical expenses. Petitioner's Brief in Support of Damages ("Brief"), at 1 n.1, ECF No. 66; Respondent's Brief on Damages ("Opp."), at 2, 15, ECF No. 67. Thus, the only area of disagreement is regarding the amount of compensation which should be awarded for pain and suffering.

Emphasizing the more than four-year duration of her left shoulder pain, the additional difficulties she encountered while pregnant and as the mother of a newborn child, and her young age – presently 38 years old, Petitioner requests $175,000.00 for

pain and suffering. Brief at 10-11. Arguing that a gap in treatment should not be equated with a lack of symptoms, Petitioner maintains that she often foreswore treatment, prioritizing her child's care over her own comfort. Petitioner acknowledges that she gained temporary relief following five cortisone injections, but insists her pain always returned at its initial severity. She characterizes her July 27, 2020 surgery as unsuccessful. *Id.* at 10. To support her requested sum, Petitioner invokes four prior SIRVA cases: *Schmitt, Reed, Wilson,* and *S.C.*[9] In each, the petitioner received awards ranging from $117,000 to $160,000. Because she requests a greater sum, it can be assumed Petitioner deems her personal pain and suffering to have been more significant.

Respondent, by contrast, argues for the lesser award of $120,000. Opp. at 13, 15. Respondent stresses the more than 28-month gap in treatment from September 2017 through January 2020, during which Petitioner gave birth to her child, sought treatment of her chronic back pain, and received multiple vaccines – several of which were administered in her left injured arm. Opp. at 13, 15. Although he "does not dispute that the treatment [P]etitioner received in 2020 . . . [is] related to her SIRVA Injury from her December 2016 flu vaccine," he maintains that the lack of treatment during this time should be considered when determining compensation. *Id.* at 13. He compares the facts and circumstances of Petitioner's case to what was experienced by the petitioners in *Nute* and *Gunter*, who received awards of only $125,000.00 for their pain and suffering.[10] Opp. at 13-14.

## B.   Analysis

### 1.   Duration and Severity of SIRVA Injury

A thorough review of the medical records reveals that Ms. Jahn suffered a moderate SIRVA injury for approximately eight months post-vaccination - through early September 2017. She then became pregnant in late 2017, and did not seek treatment for her SIRVA again until early 2020 when her daughter was approximately 17 months old. At that time, she returned for treatment in January 2020, and underwent arthroscopic

---

[9] *Schmitt v. Sec'y Health & Human Servs.*, No. 19-0021V, 2021 WL 4470101 (Fed. Cl. Spec. Mstr. Aug. 30, 2021) (awarding $118,000.00 for pain and suffering); *Reed v. Sec'y Health & Human Servs.*, No. 16-1690V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering); *Wilson v. Sec'y Health & Human Servs.*, No. 19-0035V 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (awarding $130,000.00 for pain and suffering); *S.C. v. Sec'y Health & Human Servs.*, No. 19-0341V, 2021 WL 2949763 (Fed. Cl. Spec. Mstr. June 14, 2021) (awarding $160,000.00 for pain and suffering). .

[10] *Nute v. Sec'y Health & Human Servs.*, No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2018); *Gunter v. Sec'y Health & Human Servs.*, No. 17-1941V, 2020 WL 6622141 (Fed. Cl. Spec. Mstr. Oct. 13, 2020).

surgery in late July. She last sought treatment for her SIRVA in late December 2020, receiving her fifth steroid injection at that visit.

### i.   Initial Eight Month Period: Vaccination Through Early-September 2017

Prior to receiving the flu vaccine on December 28, 2016, Petitioner (then age 34) suffered from left lumbar radiculopathy, diagnosed in late 2015 but occurring since 2010. Exhibit 6 at 2 (October 5, 2015 diagnosis), 14 (duration of five years noted in an October 16, 2015 record). Diagnoses of lumbar disc displacement and spinal stenosis were added several weeks later, and Petitioner was administered a lumbar epidural steroid injection on October 16, 2015. *Id.* at 10-11. The day after vaccination, Petitioner received treatment from her acupuncturist for her back pain, as well as arthritis in her foot and an issue with her right knee. Exhibit 17 at 7.

Petitioner reported her left shoulder pain at the next visit to her acupuncturist on January 9, 2017, twelve days post-vaccination. Exhibit 17 at 8. Four days later, she visited an urgent care clinic complaining of left shoulder pain, described as a constant dull ache, and decreased ROM. Exhibit 2 at 2.

On January 27, 2017, Petitioner was seen by an orthopedist who administered a steroid injection. Exhibit 3 at 2. At her next appointment on February 17, 2017, she reported 90 percent relief but a recent return of her pain. *Id.* at 6. By her first PT session on February 22, 2017, Petitioner rated her pain as seven at its worst and three when resting. Exhibit 5 at 2. She attended 20 PT sessions from February through early September 2017. Exhibit 5.

When seen again by the orthopedist on April 27, 2017, Petitioner reported improved ROM but continued pain. Exhibit 4 at 4. Despite expressing some reservation due to her attempts to get pregnant, Petitioner consented to a second steroid injection. She noted that she was certain she was not pregnant at that time. *Id.* at 5.

When she returned to the orthopedist on July 21, 2017, Petitioner reported that her "pain [wa]s substantially better than it has been." Exhibit 4 at 3. The orthopedist opined that Petitioner's "rotator cuff syndrome has been alleviated." *Id.* Petitioner's last PT session was on September 1, 2017. Exhibit 5 at 62-63.

### ii.   Relief for 28 Months: Early-September 2017 Through Mid-January 2020

It appears Petitioner obtained significant relief from the second steroid injection she received in April 2017 – bulwarked by the fact that she did not complain of left shoulder pain again until January 16, 2020 (nearly three years later). At that visit,

however, Petitioner reported that this second injection, administered on April 27, 2017, provided relief for only about one year. Exhibit 27 at 117.

During this 28-month gap in treatment, Petitioner became pregnant, giving birth to her daughter in August 2018. Exhibit 23 at 559-566. Although she insists that she continued to suffer significant left shoulder pain, but did not seek treatment due to a desire to focus on her daughter, these assertions are not fully supported by the medical records. The medical records show Petitioner complained of other ailments during this 28-month period, specifically restless leg syndrome, back spasms, and lower back and leg pain. Exhibit 23 at 245, 545; Exhibit 27 at 38. Additionally, after receiving her next flu vaccine in her opposing right shoulder on November 1, 2017, Petitioner again received vaccines in her left injured shoulder in September 2018 and October 2019. Exhibit 20 at 3-4.

When seen for her lower back and leg pain in late 2019, Petitioner declined a lumbar steroid injection and formal PT. Exhibit 27 at 40, 90. These actions provide some support for her assertion that she experienced some left shoulder pain during this time but did not pursue treatment. Still, the complaints of lower back and leg pain signal these were the greater symptoms.

### iii. Surgery and Additional Treatment: January Through December 2020

When Petitioner sought treatment again for her left shoulder pain on January 16, 2020, she reported a return of pain while nursing and interacting with her daughter - now a toddler, and a desire for treatment due to a worsening of this pain. Exhibit 27 at 117. Indicating Petitioner could receive a steroid injection every three months, the orthopedist administered Petitioner's third steroid injection. Exhibit 27 at 117-18.

At a virtual appointment in early May 2020, Petitioner reported "100% relief from her shoulder pain from her cortisone injection in January for about 2 months" but a return of "the same symptoms." Exhibit 24 at 12. After reviewing an MRI taken a few days later which showed a small rotator cuff tear, the orthopedist recommended arthroscopic surgery. *Id.* at 21.

Following surgery, performed on July 27, 2020, Petitioner reported a significant improvement in her pain. Exhibit 26 at 150 (follow-up orthopedic visit on August 20, 2020). Although recent events had "mildly aggravated [her] shoulder pain," Petitioner still described her pain as "not severe." *Id.*  At her first post-surgery PT session, Petitioner described her pain as ranging between one and five. Exhibit 28 at 5. By her eighth visit on September 21, 2020, Petitioner's pain had decreased to between zero and three. *Id.* at 35.

On October 15, 2020, Petitioner received a fourth steroid injection. Exhibit 26 at 223. When attending her fifteenth post-surgery PT session on October 27, 2020, she reported improvements such as the ability to drive without pain. Exhibit 28 at 55. At her next PT session on November 2, 2020, Petitioner reported "feeling pretty good [but] still with some pain down the side/front of [her] arm." *Id.* at 61.

Petitioner last attended PT for her left shoulder on November 30, 2020. Exhibit 28 at 77-79. She received her fifth and final injection, guided by ultrasound, on December 31, 2020. Exhibit 30 at 25. According to her PT records, Petitioner was also treated for her lower back pain in December 2020 and January 2021. Exhibit 28 at 81-110. On January 12, 2021, Petitioner was discharged from PT due her failure to schedule any session after her December injection. Exhibit 28 at 80.  There is no evidence that Petitioner pursued treatment for left shoulder pain after 2020.

## 2.    Comparison to Other Awards

Although the cases cited by Petitioner involve a gap in treatment – and thus reflect her tacit acknowledgement that the gap in this case bears on the award she should receive - the circumstances in these cases are not otherwise comparable with Petitioner's case. Additionally, the awards in several of those cases are significantly *less* that what Petitioner is seeking, and she has not explained how the cases are supportive of the amount she requests for pain and suffering.

When determining the appropriate amount of compensation in this case, I find *Gunter* to be most instructive. Like the present Petitioner, the *Gunter* petitioner suffered a moderate SIRVA injury for eleven months during which she underwent conservative treatment – oral steroids and PT, a thirteen-month gap in treatment thereafter, and more significant treatment, including arthroscopic surgery, before her SIRVA was resolved. *Gunter,* 2020 WL 6622141, at *2.

However, there are differences as well – and they actual counsel in favor of a higher award than what occurred for these comparable petitioners. For example, Petitioner's overall injury lasted much longer than that suffered by the *Gunter* petitioner – four years, as opposed to 20 months. *Gunter,* 2020 WL 6622141, at *2. And Petitioner was administered five steroid injections in an attempt to alleviate her pain. Although the *Gunter* petitioner experienced pre-surgery symptoms for a slightly longer period, Petitioner's recovery post-surgery was slower. Moreover, even though the gap in treatment in Petitioner's case was longer, she had a more compelling reason for the absence of any treatment – her pregnancy and need to care for her newborn child. *Id.*

At the same time, these considerations are countered by relevant factors such as

10

the lower back and leg pain Petitioner has experienced since 2010. This unrelated source of pain likely accounted for some of the suffering Petitioner experienced, especially during her 28-month gap in treatment when she sought treatment for this condition, but not her left shoulder pain. Thus, I find an award only slightly above that awarded in *Gunter* is appropriate.

I do not, however, include any component of damages for future pain and suffering. As I stated in *Accetta*, I find that an award for *future* pain and suffering is appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). In this case, Petitioner has not established that the sequela of her SIRVA continued beyond 2020.

## V.    Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[11] I also find that Petitioner is entitled to $1,694.55 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $136,694.55 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.